**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

|                                                    |     |                                      |
| -------------------------------------------------- | --- | ------------------------------------ |
| UNITED STATES OF AMERICA EX REL. ROBERT C. SEARLE, | )   |                                      |
|                                                    | )   |                                      |
|                                                    | )   |                                      |
|       Plaintiff,                                   | )   |                                      |
|                                                    | )   |                                      |
| v.                                                 | )   | Civil Action No. 1:14-cv-00402       |
|                                                    | )   |                                      |
| DRS TECHNICAL SERVICES, INC., ET AL.,              | )   |                                      |
|                                                    | )   |                                      |
|       Defendants.                                  | )   |                                      |
|                                                    | )   |                                      |

**MEMORANDUM OPINION**

THIS MATTER comes before the Court on the motions for summary judgment filed by Plaintiff, Defendant The Tolliver Group, Inc., the DRS Defendants, and Plaintiff's motions to strike declarations offered by Defendants. The Court finds that there are no issues of genuine material fact, and all Defendants are entitled to judgment as a matter of law on all claims asserted against them in this action.

Plaintiff first claims that TTGI violated the False Claims Act ("FCA") by proceeding with the creation of Technical Manuals for the 910 MCV-Mine Clearing System under Task Order 10 of its contract with the Army without a government-furnished technical data package ("TDP"). Second, Plaintiff contends that TTGI violated the FCA because of certain alleged deviations between

1

the final version of the Operator's Manual and certain military standards and Army regulations referenced in the subject contract. Neither claim is meritorious.

Defendants submitted a supporting declaration made by the government contracting officer's representative ("COR"). The COR is responsible for overseeing the contractor's performance and for approving its invoices. In this case, the COR's declaration presents an insurmountable hurdle for Plaintiff. The declaration confirms that while the government indicated that it intended to provide the contractors with a TDP for use in developing the manuals, it did not do so, it knew that it did not do so, and still instructed the contractors to proceed with performance. The declaration further confirms that any deviations with military standards and/or Army regulations were approved by or done at the direction of the Army.

As a preliminary matter, this Court finds that Plaintiff's motions to strike are denied. The declarations at issue contain relevant, legally obtained information and establish the facts necessary to determine whether Plaintiff's claims are meritorious. The record does not support Plaintiff's contention that regulations were violated in obtaining the declarations. Further, Plaintiff's argument that the declarations are not self-authenticating is irrelevant. Declarations may be used to support a summary judgment motion. See Fed. R. Civ. Pro.

56(c)(4).

Per the Christner declaration, the record supports a finding that Defendants met the Touhy prerequisites for obtaining official information from employees of federal agencies as codified at 32 C.F.R. § 516.41(d) and Army Regulation 27-40, 7-2(d).[1] DRS Defendants and TTGI each sent timely, written Touhy requests to the Department of the Army stating that they requested specific information from Mr. Christner and others concerning this litigation. While not required, each Touhy request was also sent to Assistant United States Attorney Richard W. Sponseller, who represents the United States in this case. Defendants were under no obligation to inform Plaintiff or his counsel about the Touhy request and did not do so. See 32 C.F.R. § 516.41(d). Like the Defendants, Mr. Christner and the officials at the U.S. Army also complied with the Touhy regulations.

Likewise, Plaintiff offers no support for his claim that the Miller declaration is inadmissible. Similarly, Plaintiff offers no authority for his request that this Court should strike "[a]ny submittal" that relies on the Miller declaration, including the opposition of the DRS defendants to Searle's

---

[1] See generally United States ex rel. Touhy v. Ragen, 340 U.S. 462 (1951). Those prerequisites for requesting official testimony from Department of the Army employees call for requesters, like the Defendants, to "submit, at least 14 days before the desired date of production, a specific written request setting forth the nature and relevance of the official information sought." See 32 C.F.R. § 516.41(d); see also Army Regulation 27-40, 7-2(d).

motion for summary judgment, nor for his alternative request to strike 16 paragraphs of the Disputed Facts section of the DRS defendants' opposition to his motion for summary judgment. A mere accusation of bad faith is insufficient to mount an argument for striking evidence.

## I.   STATEMENT OF FACTS

### A. History and Nature of the Contract

On February 12, 2009, contract number W56HZV-09-A-A902 (the "Contract") was awarded to DRS Technical Services, Inc. ("DRS TSI"). The Contract was a Blanket Purchase Agreement ("BPA").

On August 26, 2011, Task Order 10 under the Contract was awarded to DRS TSI. Task Order 10 is the pertinent task order in this case, and was awarded on a fixed price level of effort basis. Task Order 10 had a base year-period of performance from August 26, 2011 through August 25, 2012, and gave the Army the ability to exercise an option for Option Year 1 that would extend the performance period through August 25, 2013.

Through a series of novation agreements, Task Order 10 was novated from DRS TSI to Defendant DRS C3 & Aviation Company ("DRS C3," and together with DRS TSI, "DRS Defendants") and ultimately, on September 25, 2012, to TTGI.

Task Order 10 required the contractor to create and deliver to the Army's Tank and Automotive Command ("TACOM") Technical Manuals for the 910 MCV-Mine Clearing System, also known as the

4

910 MCV 2, Medium Flail Area Mine Clearance System (the "Mine
Sweep Vehicle"). Those manuals were TM 9-2355-407-10, Operator
Manual; TM 9- 2355-407-23 RP, Field Maintenance Manual Repair
Parts and Special Tools List; and NMWR 9-2355-407, National
Maintenance Work Requirements (each a "manual" and collectively,
the "manuals").

     Task Order 10 contained a Performance Work Statement ("PWS")
which indicated that the manuals were to "enable military field
users to support their equipment with current parts information
for provisioning, and updated procedures for maintenance and
overhaul" of the Mine Sweep Vehicle. Task Order 10 also
indicated that the government intended to provide the contractor
with certain information, known as Government Furnished
Information ("GFI"), to enable it to create the manuals. As
originally drafted, Task Order 10 indicated that the expected GFI
would include a TDP from the original equipment manufacturer
("OEM"), engineering drawings, and commercial-off-the-shelf
manuals. The government also intended to provide the contractor
with at least one Mine Sweep Vehicle, to be located at the
contractor's facility.

     The U.S. Army creates a Logistics Support Analysis Record
(LSAR) for major equipment and systems such as the Mine Sweep
Vehicle. The LSAR is a logistics engineering tool populated with
logistical data. The logistical data includes all data associated

with corrective and preventive maintenance tasks. The items required to support each maintenance task are identified as well, normally including spare parts, tools, support equipment (standard and special), and personnel. The Provisioning Requirements, referenced as an LSA 036 report, are among the LSAR components. The LSA 036 report is a database updated to reflect items available for Army procurement. The LSA 036 report was also provided to the contractors pursuant to Task Order 10. TACOM did not receive the TDP from the OEM. Therefore, TACOM did not provide the contractors with a TDP for the Mine Sweep Vehicle.

On December 17, 2012, the COR prepared changes to the Contract Data Requirements List ("CDRL"). Among other things, these changes impacted the timing of the delivery of PTM #3 of the Operator Manual, the government's comments, the resubmission of the PTM, and the government's request for an FRC. These changes also impacted the timing of delivery of seven PTMs and a final FRC for each of the Field Maintenance Manual, TM 9-2355-407-23, and the Field Maintenance Repair Parts and Special Tools List, TM 9-2355-407-23P.

On December 19, 2012, the Army approved a Limited Source Justification ("LSJ") authorizing an exception to the fair opportunity process in effect at the contracting command. By the exception, the Army would modify Task Order 10 by extending the

6

period of performance, increasing the contract value, and restructuring Task Order 10 from a fixed price level of effort contract to a firm fixed price contract. The LSJ stated that the government had been unable to buy the TDP from the OEM, and although the contractor, TTGI, had been working with the OEM, the government could not obtain from the OEM its proprietary data. The LSJ further stated that vehicle characteristics, unknown to the government at the time of the award, led the government to realize that its original estimate of hours necessary to perform technical manual development was low.

On April 23, 2013, the Army awarded to TTGI Modification 08 to Task Order 10. Among other things, this modification converted Task Order 10 to a firm fixed price contract, increased the value of the Task Order, and extended the period of performance from April 22, 2013 through December 31, 2015.

Modification 08 also revised Task Order 10's performance work statement. The revisions required the contractor, TTGI, to use "commercial off-the-shelf manuals produced by the [OEM] as source data" in order to create and deliver the following Technical Manuals: (1) TM 9-2355-407-10, Operator Manual; (2) TM 9-2355-407-23, Field Maintenance Manual; and (3) TM 9-2355-407-23P, Field Maintenance Repair Parts and Special Tools List. No longer was the contractor required to create and deliver the Technical Manual NMWR 9-2325-407.

7

Modification 08 to Task Order 10 also removed the requirement that TACOM provide the TDP to the contractor. Task Order 10 never required the contractor to rely on the TDP in order to produce the Technical Manuals.

TACOM provided TTGI with three primary sources of information to create the Manuals: commercial manuals from the OEM for the Mine Sweep Vehicle, including electrical and hydraulic engineering drawings related to the Mine Sweep Vehicle; the LSAR; and two of the Mine Sweep Vehicles for use at the contractor's facility.

TACOM was aware that TTGI did not possess the TDP. Although Task Order 10 required monthly meetings between TTGI and TACOM, TACOM insisted that those meetings occur more frequently, and were regularly held on a weekly basis. During these meetings, TTGI and TACOM acknowledged that TTGI did not possess the TDP, and the ways in which TTGI would perform the contract requirements without the TDP. TACOM instructed TTGI to perform under Task Order 10, notwithstanding the fact that it did not have (and did not need) the TDP. The Contract required TTGI to proceed notwithstanding the absence of the TDP.

## B. Manual Drafting Process

In accordance with the CDRL, Task Order 10 required the contractor to submit Preliminary Technical Manuals ("PTMs"), and after verification by the Army, a Final Reproducible Copy

("FRC") for each of the required manuals.

The FRC creation process for each of the manuals is iterative. The contractor was required to deliver PTM # 1 for each manual. After the contractor delivered the PTMs, the PTMs were reviewed by a number of government agencies, including TACOM LCMC, the United States Army Training and Doctrine Command ("TRADOC"), the United States Army Combined Arms Support Command ("CASCOM"), and the Maneuvers Support Center of Excellence ("MSCOE").

Among other things, TRADOC develops and designs training and training doctrine for the United States Army. CASCOM develops and provides training courses to military personnel, and is a subordinate element of TRADOC. MSCOE, also a subordinate element of TRADOC, is responsible for development of Doctrine & Training Tactics ("DTT") that are focused on Operator "-10" level manuals and training specific to each unique piece of equipment. MSCOE is the authoritative agency that directs the MOS 12B skill set. Therefore, MSCOE can deviate from the guidelines in a MIL-STD. Army Regulation ("AR") 750-1 permits an operator to perform the tasks ascribed to them in the FRC of the Operator Manual for the 910 MCV-Area Mine Clearing System.

Ultimately, the government is responsible for verification of the manuals to assure accuracy and usability by U.S. Army Soldiers. "Usability," as determined and verified by the US Army,

rather than strict adherence to MIL-STD 45001-2, is the required standard under Task Order 10.

TACOM LCMC solicits input from each of the above entities as to the PTMs. After the review is completed, TACOM LCMC provides the contractor with a mark-up version. The mark-up included changes to the PTM iteration at the government's direction. Where no change was suggested, the government found the content of the PTM to be acceptable, in accordance with the requirements of Task Order 10, and consistent with the training doctrine that the government wanted to employ. In other words, after PTM #1 (the initial PTM), all changes were made at the express direction of the government. The FRC for each manual is reviewed, on multiple levels, by multiple governmental agencies, and confirmed to be consistent with contract requirements, the training doctrine that the government wishes to employ, and all other government requirements.

In the case of the Operators Manual, Task Order 10 required three rounds of revisions before the FRC was produced. For the Field Maintenance Manual Repair Parts and Special Tools, Task Order 10 required seven rounds of revisions before the FRC is produced. Once the contractor completes this revision process, TACOM LCMC approves the technical manual and formally requests the FRC.

The contractor was required to provide a validation

10

certificate for PTM #1 for each Technical Manual, but not for subsequent PTMs or the FRC. TTGI provided the required validation certificates for PTM #1 of each Technical Manual.

As of September 26, 2013, the Operator Manual was completed, the government requested the FRC of the Operator Manual, and TTGI delivered the FRC for the Operator Manual.  The government reviewed and approved same and published the Operator Manual.  To date, the FRC for the Operators Manual is the only FRC that has been completed and accepted by TACOM.

## C. Work Package 0103

MIL-STD-40051 establishes the technical content, style and format guidelines for the preparation of Technical Manuals. Notably, military standards are generally viewed as guidelines, not rigid requirements.  MIL-STD-40051 has been revised several times. Task Order 10 originally required that the contractors reference MIL-STD-40051-2A in order to create the manuals. Modification 2 of Task Order 10 changed that, requiring that the contractors reference MIL- STD-40051-2 with Change 3. MIL-STD-40051-2A required that a "-10" manual, such as the Operator Manual, include a work package titled "Service Upon Receipt." MIL-STD-40051-2 with Change 3 prohibits a work package titled "Service Upon Receipt."

At the time that Task Order 10 incorporated MIL-STD-4051-2A, the contractors produced a work package titled "Service Upon

Receipt" as part of the Operator PTM #1.  Despite the
modification to Task Order 10 regarding the applicable version of
MIL- STD-40051, TACOM directed TTGI to create such a work
package and include it in the Operator Manual.  In accordance
with the instruction, TTGI included Work Package 0103 titled
"Service Upon Receipt" in the Operator PTM.  Throughout the
review process described above, the Operator PTM included a work
package titled "Service Upon Receipt," and TACOM and the other
government agencies described above approved of the inclusion of
said work package.

### D. General Purpose Gloves and Gasket

The gasket listed in the FRC of the Operator Manual was
listed in error.  Any inaccuracy was not the fault of the
contractors, and has since been corrected by the government. The
data provided to the contractors contains an entry for general
purpose gloves under NSN 8415-01-136-0078.  TTGI notified TACOM
that the general purpose gloves in the data provided by TACOM
were no longer available. Based on TTGI's input, TACOM updated
the information. When TACOM approved the Operator Manual and
requested that TTGI produce the FRC, the Operator Manual
contained a reference to general purpose gloves that were
procurable.[2]

_____

[2] The Miller Declaration and the Christner Declaration provide that these
gloves were listed in the LSA036 report.  As noted by Relator in his motion to
strike the Miller Declaration, the LSA036 Report does not contain a list of

## E. Trouble Shooting Instructions

Paragraphs 77 through 96 of the First Amended Complaint allege that the Operator Manual incorrectly applies MIL-STD 40051-2 by providing incorrect troubleshooting procedures or by allowing vehicle operators to make certain repairs to the Mine Sweep Vehicle. To the extent that the FRC of the Operator Technical Manual contains any variation from MIL-STD-40051-2A, or any other purported requirement, the variations were approved by MSCOE and executed—sometimes even directed—by TACOM.

Likewise, Paragraphs 97 through 112 of the First Amended Complaint allege that the Operator Manual incorrectly applies MIL-STD 40051-2 by stating that vehicle operators could change a fuse on the Mine Sweep Vehicle.  To the extent that the FRC of the Operator Technical Manual contains any variations from MIL-STD-40051-2A, or any other purported requirement, those variations were approved by MSCOE and executed—sometimes even directed—by TACOM.

Further, Paragraphs 113 through 196 of the FAC allege that the Operator Manual incorrectly applies MIL-STD 40051-2 by stating that vehicle operators could make various repairs to the Mine Sweep Vehicle. To the extent that the FRC of the Operator Manual contains any variations from MIL-STD-40051-2A, or any

expendable/durable items, such as gloves.  The precise location of this list is not material to the parties' dispute.  That this information was provided to TTGI by the government—which Relator does not dispute—is the pertinent fact.

other purported requirement, those variations have been approved by MSCOE and executed—sometimes even directed—by TACOM.

DRS TSI, DRS, C3A and TTGI performed as required under the Contract and Task Order 10 (as modified). To the extent that Plaintiff challenges what he perceives to be deviations from the PWS or other requirements, those deviations were knowingly and intentionally accepted by the government.

**F. Certifications**

The COR was and remains responsible for reviewing all certifications provided by the contractors. With delivery of each PTM # 1, the contractor was required to and did provide a validation certificate. The COR reviewed and accepted the validation certificates referenced herein.

Contrary to Plaintiff's assertion, none of the certifications Defendants submitted contained a "certification of the accuracy and completeness of work to TACOM, including conformity to all standards, regulations and FARs (sic) [Federal Acquisition Regulation] in the PWS [Performance Work Statement," nor was such certification required.

Further contrary to Plaintiff's assertion, none of the certifications Defendants submitted contained a "certification of compliance with Contract PWS, regulations, standards, and DFARS [Defense Federal Acquisition Regulation Supplement], as well as granting Government data rights," nor was such certification

14

required.

Under Task Order 10, payment was first made on a fixed price level of effort basis. After Modification 08, effective April 23, 2013, payment was made on a firm fixed price basis. These progress payments were made in full. Defendants provided the Court copies of the invoices submitted by TTGI prior to Modification 08 (when Task Order 10 was being performed as a fixed-price level of effort contract). The COR approved those invoices for payment. At the time the COR did so, and at the time that the invoices were paid, the government was aware that the contractor did not have the TDP and of the processes being implemented to perform the requirements of Task Order 10 as modified. Likewise, Defendants submitted copies of the invoices submitted by TTGI after Modification 08 (when Task Order 10 was being performed as a fixed-price contract). The COR approved those invoices for payment. At the time the COR did so, and at the time that the invoices were paid, the government was aware that the contractor did not have the TDP. The government was also aware of the processes being implemented to perform the requirements of Task Order 10 as modified.

It appears to the Court that the only data TTGI provided the government regarding the Technical Manuals was derived by TTGI from its reverse engineering and "100% hands-on validation" of PTM#1, or otherwise available from commercial, off-the shelf

15

manuals.  TTGI had all necessary rights to provide that information to the government and did not violate Task Order 10 or any other requirement or regulation by doing so.

It further appears to the Court that TTGI had no intent to submit any false certification or claim of any type.  To the contrary, TTGI has performed its obligations under Task Order 10 in good faith, and in compliance with the requirements of modified Task Order 10 and the express direction it received from TACOM.  The FRC of the Operators Manual conformed to those requirements and directions, as will the FRC of the other Technical Manuals  that will be provided to the government.

## II.  OPINION

### A.    Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment will be granted unless "a reasonable jury could return a verdict for the nonmoving party" on the evidence presented. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An otherwise properly supported summary judgment motion will not be defeated by the existence of a dispute as to immaterial facts; only disputes over facts that might affect the outcome of the trial will properly preclude the entry of summary judgment. Id. at 248.

16

"Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of [the nonmoving party's] case." Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002) (citation omitted) (internal quotation marks omitted); Hoschar v. Appalachian Power Co., 739 F.3d 163, 169 (4th Cir. 2014). Plaintiff bears the initial burden of proof as to each and every element of his claims. See United States ex rel. Berge v. Bd. of Trustees of the Univ. of Alabama, 104 F.3d 1453, 1462 (4th Cir. 1997). As demonstrated herein, Plaintiff has failed to meet its burden on any elements of its claims, and TTGI is entitled to judgment as a matter of law. There exists no genuine dispute of material fact, and Defendants are entitled to judgment as a matter of law.

**B.   Discussion**

In the case at hand, material facts are not in dispute. As a matter of law, Defendants neither violated nor conspired to violate the Federal Claims Act.

**1.   Defendant TTGI has not violated 31 U.S.C. § 3729(a)(1)(A).**

TTGI is entitled to summary judgment on Plaintiff's claims for violation of § 3729(a)(1)(A) (Counts I through VIII). The elements of a claim under § 3729(a)(1)(A) are as follows: (1) a false statement or fraudulent course of conduct, (2) made with requisite scienter, (3) that is material, and (4) that

17

results in a claim to the government. United States v. Triple Canopy, Inc., 775 F.3d 628, 634 (4th Cir. 2015). Plaintiff fails to demonstrate the elements of this claim.

Plaintiff fails to establish that TTGI violated 31 U.S.C. 3729 (a)(1)(A) because Plaintiff has not demonstrated that TTGI made a false statement, either express or implied. A claim under the FCA must be predicated upon a false statement. See Triple Canopy, 775 F.3d at 634; see also 31 U.S.C. § 3729(a)(1)(A).

The First Amended Complaint purports to quote express certifications that Plaintiff contends were provided by TTGI. However, none of the certifications that Plaintiff quotes, and upon which his claims are seemingly based, were proven to exist. The alleged certifications were contradicted in the Christner and Miller declarations. Plaintiff cannot establish his claim by reliance on express certifications that TTGI did not give.

TTGI provided few certifications related to its work on the contract. TTGI provided a validation certificate for the first iteration (i.e., "PTM #1") of each of the Technical Manuals. As the Miller declaration established, TTGI did not certify a subsequent PTM or FRC, nor is it required to do so. TTGI also certified that the hours reflected on its invoices had actually been worked. Both the Miller and Christner declarations made clear that there are no other express certifications by TTGI.

The record contains no evidence or allegation that any of

18

the express certifications submitted by TTGI were false.
Moreover, it appears to the Court that during his deposition,
Plaintiff conceded that his claims are not based on an express
certification. Plaintiff also admitted that his claims are not
based on preliminary technical manuals. Given the absence of
evidence of falsity and Plaintiff's own testimony that his claim
is not based on express certification, TTGI is entitled to
judgment as a matter of law as to any claims based on express
certification.

Plaintiff's Motion for Summary Judgment asserts for the
first time that this case is based on the theory of implied
certification. While recognized by the Fourth Circuit, the theory
of implied certification is "prone to abuse by parties seeking to
turn the violation of minor contractual provisions into an FCA
action." Triple Canopy, 775 F.3d at 637 (internal citations
omitted). To protect against abuse, the Fourth Circuit held that
an implied certification claim requires proof that the
contractor, with the requisite scienter, made a request for
payment and withheld information about its noncompliance with
material contract requirements. Triple Canopy, Inc., 775 F.3d at
636. In other words, in an implied certification case, failing
to meet a contractual requirement is insufficient to establish
liability. Id. Plaintiff must also allege a fraudulent scheme
involving withholding material information from the government.

19

Id.

Triple Canopy provides an example of a contractor withholding information about noncompliance with material contract terms. In Triple Canopy, a contractor agreed to provide security services for the U.S. Army at an airbase in Iraq. Id. at 632. The contract required that the members of the security detail satisfy a marksmanship requirement and maintain scorecards in their personnel files. The guards, however, could not pass the marksmanship requirement, and the contractor knew it. Id. In order to cover up the guards' shortcoming, the contractor's supervisors directed that false scorecards be placed in the guards' personnel files. Id. at 632, 638. The false scorecards were post-dated and contained inflated scores on the guards' marksmanship tests. Id. Based on these facts, the Fourth Circuit concluded:

> "[T]he Government has sufficiently alleged a false claim . . . The complaint contains an abundance of allegations that Triple Canopy did not satisfy this requirement and, instead, undertook a fraudulent scheme that included falsifying records to obscure its failure. The Government's complaint also properly alleges that Triple Canopy's supervisors had actual knowledge of the Ugandan guards' failure to satisfy the marksmanship requirement and ordered the scorecards' falsification."

Id. at 637.

The case at hand is distinguishable from Triple Canopy. This case exemplifies the abuse forewarned by the Fourth Circuit when

implied certification claims are not strictly construed. These facts do not contain any allegation of a fraudulent scheme. Plaintiff asserts alleged deficiencies that might theoretically give rise to a contract dispute, but he does not allege any facts related to a fraudulent scheme, a cover up, or falsified records. Generally, Plaintiff alleges that TTGI breached the contract in two ways: TTGI commenced performance without the TDP; and certain terms of the FRC of the Operator Manual potentially varied from certain military standards specified in Task Order 10. Plaintiff cannot point to any admissible evidence to show that TTGI "withheld information about its noncompliance" from TACOM. Triple Canopy, 775 F.3d at 636.

First, the Miller and Christner declarations establish that the government knew that the contractors did not possess the TDP, yet instructed the contractors to proceed with performance. In deposition, Plaintiff agreed that TACOM knew TTGI did not have the TDP. The government ultimately modified Task Order 10 to account for the TDP's absence. Information known to the government cannot be said to have been withheld by the contractor. There can be no liability under the FCA when the alleged noncompliance was known to the government. See United States ex rel. Ubl v. IIF Data Solutions, 650 F.3d 445, 452-53 (4th Cir. 2011).

Second, the potential variance between the FRC of the

21

Operator Manual and the military standards specified by Task Order 10 likewise do not constitute a false statement under an implied certification theory.  The Christner and Miller declarations establish that any variances from specified military standards contained in the FRC were approved and often directed by TACOM.  Those variances were studied by various agencies, including TRADOC, and determined to be consistent with U.S. Army training doctrine. Following government instructions cannot constitute a false claim.

Plaintiff also complains about the inclusion of a reference to a gasket that is not procurable. The Christner and Miller declarations explain that the gasket listed in the FRC of the Operator Manual was listed in error. As the Christner declaration explained, the error occurred because the U.S. Army provided TTGI with a version of the LSA 036 Report of procurable parts that incorrectly included an entry for gasket that was not procurable. Both declarations noted that TTGI relied on the version of the LSA 036 Report that was provided to it by the U.S. Army. Plaintiff cannot base False Claims Act liability on a contractor's reference to an NSN that was provided to the contractor by TACOM. See United States ex rel. Ubl, 650 F.3d at 452-53.

Plaintiff also complains about the reference to a certain pair of general purpose gloves which were specified in the LSA

22

036 Report provided by the government. The declarations note that TTGI made TACOM aware of the fact that the specified gloves were not available and the data was updated. Again, TTGI's reference to gloves that were specified by the government cannot serve to impose liability under the FCA.

The facts of this case do not support an implied certification claim. There is no evidence of noncompliance, much less evidence that TTGI withheld that fact from the government. The only evidence demonstrates that the government was aware of, and even directed, the very issues about which Plaintiff complains. This case is precisely the type the Fourth Circuit had in mind when it stated, "the purposes of the FCA [are] not served by imposing liability on honest disagreements, routine adjustments and corrections, and sincere and comparatively minor oversights, particularly when the party invoking [the FCA] is an uninjured third party." Triple Canopy, 775 F.3d at 635 (internal quotation marks omitted). At best, Plaintiff, an uninjured third party, has alleged nothing more than honest disagreements and minor oversights.

Second, Plaintiff fails to establish that TTGI violated 31 U.S.C. 3729 (a)(1)(A) because the evidence before the Court demonstrates that TTGI acted in good faith. In order to show scienter, Plaintiff must prove that the contractor made a false statement knowingly, with deliberate ignorance, or in reckless

23

disregard for the truth. United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co., 612 F.3d 724, 728 (4th Cir. 2010). The FCA, however, is not designed to "punish honest mistakes or incorrect claims submitted through mere negligence." Id. at 728. The FCA is a fraud prevention statute. It does not allow a qui tam Plaintiff to "shoehorn what is, in essence, a breach of contract action into a claim that is cognizable under the False Claims Act." United States ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 373 (4th Cir.2008); Owens, 612 F.3d at 728-29.

The Fourth Circuit recognizes that FCA liability must be limited to those instances that truly concern fraud, else government contractors acting in good faith would be rightly dubious about working with the government. See Owens, 612 F.3d at 729. Applying FCA liability to routine contract disputes "would burden, not help, the contracting process, thereby driving up costs for the government and, by extension, the American public." Id. at 727. Therefore, the Fourth Circuit has held that, "[t]o support an FCA claim, there needs to be something more than the usual back-and-forth communication between the government and the contractor over this or that [] defect and this or that corrective measure. Such altogether routine dialogue is a far cry from fraud." Owens, 612 F.3d at 729.

Plaintiff proceeds on the theory of implied certification, which the Fourth Circuit recognizes as fertile ground for abuse by plaintiffs who attempt to turn mere contract variances into fraudulent schemes under the FCA. Triple Canopy, 775 F.3d at 637. As a result, the Fourth Circuit held that courts must require "strict enforcement of the Act's materiality and scienter requirements" in order to protect contractors from being subjected to FCA liability for every alleged contract breach. Id. at 637 (noting that the plaintiff established scienter and materiality because the defendant "orchestrated a scheme to falsify records and engaged in a cover up.").

Owens provides a strong example of the type of routine deviations from a contract that do not amount to fraud. In Owens, the contractor agreed to build the U.S. embassy in Baghdad, and the Plaintiff alleged numerous deficiencies in the construction of the embassy. Owens, 612 F.3d at 727-28. The Plaintiff alleged that the contractor's concrete work was substandard and required repair. The Fourth Circuit, however, recognized that any problems with the concrete were to be expected on such a contract and did not indicate fraud. Id. at 729 ("[i]t would be remarkable if, on a project of this magnitude and scale, there were not some issues that quality control personnel would want to bring to supervisors' attention. That is after all what a quality control department exists to do."). The Plaintiff also argued that the

25

contractor violated the contract by using the wrong size rebar in its concrete. The Fourth Circuit held that disputes over the size of rebar were at best contract claims, not false claims, because the Plaintiff had no evidence that the contractor had misled the government.  Id. at 730 ("What [Plaintiff's] allegations do not raise is an issue of triable fact on the possibility that [the contractor] somehow dissembled in billing for its concrete work and submitted actionable false claims."). Id. at 730.

The Plaintiff in Owens also alleged that the contractor violated the contract by supplying substandard security items, like metal detectors and security cameras, including products that were the wrong brand or poor quality. Id. at 731. The contractor, however, offered uncontradicted evidence that it had obtained permission from the government to provide the equipment that it did.  Id. Because the contractor had informed the government of the alleged deviations from the contract, the Fourth Circuit held that the evidence failed to show that the contractor had the necessary scienter. Id. ("[G]iven the absence of any showing of bad faith on First Kuwaiti's part, there is no basis to conclude that those invoices were knowingly false.").

In the case at hand, analogous to Owens, Plaintiff failed to offer evidence that TTGI engaged in fraud or otherwise had the requisite scienter to falsely bill the government. The government

was aware that the TDP was not available to the contractors and instructed the contractors to proceed without the TDP. The government modified Task Order 10 to be consistent with that instruction, and did so before the FRC of the Operator Manual was provided. TTGI followed the government's directives, and its doing so cannot be said to have been evidence of scienter. See Owens, 612 F.3d at 734-35; United States ex rel. Ubl, 650 F.3d at 452.

Similarly, the potential variances between certain military standards and the FRC of the Operator Manual were approved and/or directed by the government, as evidenced in the Miller and Christner declarations. The declarations states that Plaintiff did not work on the Operator Manual and did not have personal knowledge of the verification process with the U.S. Army. The FRC was a product of the collaborative efforts of TTGI, TACOM and other government agencies. Even if one were to question those variances, there is no evidence that TTGI acted other than in good faith and with government approval/direction. The issues regarding the gloves and gaskets were, at most, good faith mistakes, which have been corrected.

Plaintiff's purported evidence on scienter demonstrates that his allegations are at best related to a breach of contract. His purported evidence essentially consists of the contract and the finished product: the FRC for the Operator Manual.  Plaintiff

27

does not point to any usual evidence of fraud, such as falsified documents or depositions of employees of the contractor or government officials that would indicate a fraudulent scheme. Plaintiff does not point to any evidence that the alleged defects were the result of something more than negligence. If every potential defect in a contract gave rise to FCA liability, as Plaintiff suggests, the government contracting process would be severely hampered and honest contractors would be reluctant to work with the government. See Owens, 612 F.3d at 729. As the Fourth Circuit made clear, Plaintiff must prove more than negligence. Id. In the case at hand, Plaintiff has not proven negligence, much less scienter.

Third, Plaintiff fails to establish that TTGI violated 31 U.S.C. 3729(a)(1)(A) because Plaintiff cannot show materiality. The FCA defines the term "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4); see also Triple Canopy, 775 F.3d at 639. The U.S. Supreme Court defines "materiality" as "[having] a natural tendency to influence, or [being] capable of influencing, the decision of the decisionmaking body to which it was addressed." Kungys v. United States, 485 U.S. 759, 770, (1988). The Supreme Court subsequently elaborated on that definition, citing to the Restatement (Second) of Torts, which provides that a matter is "material" if: (a) a

reasonable man would attach importance to [the matter's] existence or nonexistence in determining his choice of action in the transaction in question; or (b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it. Neder v. United States, 527 U.S. 1, 22, (1999); Restatement (Second) of Torts § 538 (1977).

Certainly, the alleged false express certifications described in the FAC were not material to the government, because they were never provided. Because those certifications were not provided, they cannot be said to have influenced any decision by the government, or to have otherwise have been material in any way. They do not exist.

With respect to the new-found notion of an implied certification, all of the information which Plaintiff contends to have been false was known to the government. The government knew that TTGI did not have the TDP, yet directed TTGI to commence performance under Task Order 10. The government knew that portions of the FRC of the Operator Manual potentially varied from certain military standards, and approved or directed those variances.

The government, not TTGI, specified the gaskets, gloves and other parts to be referenced in the manuals. TTGI informed the

29

government that the gasket and gloves were unprocurable, and the government made the necessary corrections to its data. In sum, this information was known to the government.

Plaintiff presumes, but has not proven, that Task Order 10 could not be performed without the TDP. The evidence before the Court indicates that Task Order 10 was performed with the government's knowledge and express direction.

Plaintiff likewise presumes, because he does not know, and certainly cannot prove, that the potential variances between portions of the FRC of the Operator Manual and various military standards in Task Order 10 render false any certification (express or implied) given by TTGI. But the uncontroverted evidence in the record demonstrates that the government approved and/or directed those variances. Plaintiff also presumes, because he does not know and cannot prove, that TTGI's references to unprocurable gloves and a gasket in the FRC of the Operator Manual exposes it to liability under the False Claims Act. But those references were specified in the data provided to TTGI. Any mistake connected with those references has since been corrected.

In order to show materiality, Plaintiff would have to show that the government's decision to provide payment to TTGI would have been influenced by these alleged defects. In other words, Plaintiff would have to show that if the government knew about

these defects, it would not have paid TTGI.  The uncontroverted record establishes that is not the case:  for every alleged deficiency complained of by Plaintiff, TACOM either knew about it or, with respect to the NSN numbers, provided TTGI with inaccurate information.

Finally, Plaintiff fails to establish that TTGI violated 31 U.S.C. 3729(a)(1)(A) because Plaintiff has not shown that the U.S. Army suffered damages. Plaintiff bears the burden of proving that the government was damaged by the false claims he alleges. See 31 U.S.C. § 3731(c); United States ex rel. Harrison v. Westinghouse Savannah River Co., 352 F.3d 908, 923 (4th Cir. 2003). Within the Fourth Circuit, damages are equal to the "amount of money the government paid by reason of the false statement above what it would have paid absent the false statement." Harrison, 352 F.3d at 922-23; see also 31 U.S.C. § 3729(a) (plaintiff is entitled to damages that the government sustains because of the defendant). The plaintiff must make a showing that the government did not "get what it paid for" or that another contractor would have performed the contractor for less without the false statements. Harrison, 352 F.3d at 922-23.

Here, Plaintiff contends that every reference within the Operator Manual to any alleged deviation from a military standard requires disgorgement of the entire contract. Such a

31

calculation of damages was expressly rejected by the Fourth
Circuit. <u>Harrison</u>, 352 F.3d at 922-23. Further, Plaintiff has
not made any attempt to show what additional amount the
government paid because of the alleged false statements. In
fact, with respect to the TDP, the uncontroverted evidence shows
that TACOM—knowing full well that TTGI did not have the TDP—
requested a sole source justification to expeditiously award the
modified contract to TTGI. TACOM did so because only TTGI had
the required engineering expertise to quickly validate the
manuals against the vehicle. In other words, TACOM would have
had to spend more money, not less, had it been forced to use a
contractor other than TTGI. Under the standard set forth in
<u>Harrison</u>, Plaintiff cannot point to any facts that support the
argument that TTGI submitted a false statement that somehow cost
the government more money. There is no evidence of harm, and
TTGI is entitled to summary judgment.

### 2. DRS Defendants have not violated 31 U.S.C. § 3729(a)(1)(A).

Incorporating the arguments made in favor of TTGI above,
DRS Defendants are entitled to summary judgment on Plaintiff's
claims for violation of § 3729(a)(1)(A) (Counts I through VIII)
because DRS Defendants did not make any false statements, DRS
Defendants did not knowingly or recklessly deceive the
government. The record reflects that DRS TSI did not present any

32

claim for payment under Task Order 10. The Christner declaration reflects that there DRS C3 presented four Task Order 10 invoices for payment, it did so pursuant to that task order's terms that at the time provided for payment based on a firm fixed price, level of effort. The Christner declaration further explained that payment on Task Order 10 was not based on the accuracy of the content of the manuals. Instead, as previously stated, on August 26, 2011, when the U.S. Army awarded Task Order 10, payment was predicated on a firm fixed price, level of effort. DRS C3 invoiced the government in a manner consistent with that requirement. Later, on April 23, 2013, with the issuance of Modification 08, progress payments were predicated on a firm fixed price. Plaintiff cannot show that either DRS defendant presented a false or fraudulent claim for payment.

Moreover, Plaintiff cannot show that either DRS defendant made any express false statement. Plaintiff bases his nearly 400 False Claims Act allegations against all of the defendants upon the purported presentation of "certification of the accuracy and completeness of work to TACOM, including conformity to all standards, regulations, and FARs listed in the PWS." However, Plaintiff failed to identify that certification. The Christner declaration affirms that neither DRS defendant certified anything relative to the "accuracy and completeness of work to TACOM." Thus, Plaintiff cannot establish that DRS Defendants

33

violated 31 U.S.C. 3729 (a)(1)(A) because Plaintiff has not demonstrated that TTGI made an express or implied false statement. See Triple Canopy, 775 F.3d at 634; see also 31 U.S.C. § 3729(a)(1)(A).

Notably, the DRS Defendants transferred all rights and liabilities via novation agreement and are therefore not liable under the Federal Claims Act.

Neither DRS defendant is liable under the FCA because, under the novation agreements, each transferred all rights and liabilities associated with Task Order 10—first from DRS TSI to DRS C3 and then from DRS C3 to TTGI. The Federal Acquisition Regulation ("FAR") recognizes that a novation agreement is a contract executed by the Transferor; (ii) the Transferee; and (iii) the government, by which, among other things, the Transferee becomes the "Contractor," 48 C.F.R. (FAR) § 42.1204(i)(b)(4), and the Transferor guarantees the performance of all obligations the Transferee has under the contracts, id., § 42.1204(i)(b)(8). Thus, because activities, such as the submission of claims are unrelated to the performance of the contract, the guarantee obligations pursuant to a novation agreement, such as that of DRS TSI to DRS C3 and that of DRS C3 to TTGI, do not extend to liability under the FCA. Cf. United States ex rel. Taxpayers Against Fraud v. Singer Co., 889 F.2d 1327, 1332 (4th Cir. 1989) (transferor assumes liability for

34

performance of contract, but not for any statutory liability under the FCA because alleged fraudulent activity is unrelated to the performance of the contract).

Counts I and II of Plaintiff's First Amended Complaint essentially allege that the defendants should not have begun or to have continued to work on the technical manuals without having a Technical Data Package ("TDP"). Counts III through VIII of the First Amended Complaint are based on what Plaintiff claims is written in the FRC of the Operator Technical Manual. But the Christner declaration notes that the manual was received by the government on December 12, 2013. Neither DRS defendant was "Contractor" at time of that submission.

The novation agreements preclude a finding of the DRS defendants' liability based on any violation of the FCA even if TTGI had committed one, which it did not.

Adopting the arguments made above, Plaintiff failed to establish materiality necessary for a theory of implied certification against DRS Defendants. Plaintiff failed to show that the DRS defendants acted with requisite scienter, and assuming *arguendo* that any knowledge could be established, such knowledge would be negated by the government's established knowledge of deviation from Task Order 10. That government knowledge was made clear in the Christner and Miller declarations. Finally, as against TTGI, Plaintiff failed to

35

establish any damages created by the DRS Defendants' action or inaction.

As to DRS Defendants just as to TTGI, Plaintiff's claims were contradicted by the Christner and Miller declarations.

### 3. TTGI and DRS have not engaged in a conspiracy under 31 U.S.C. § 3729(a)(1)(C).

Count IX of the First Amended Complaint alleges a conspiracy between Defendants and is predicated on 31 U.S. C. § 3729(a)(1)(C). In order to plead a claim under this section, Plaintiff must allege the existence of an unlawful agreement among Defendants to have a false claim reimbursed by the Government. "[P]laintiff must prove that the defendant intended that the false statement be material to the Government's decision to pay or approve the false claim." Allison Engine Co. v. United States ex rel. Sanders, 553 U.S. 662, 663 (2008). Moreover, Plaintiff must allege that Defendants agreed to use a false statement to reach their unlawful purpose.  Id. at 665.

The only agreement between TTGI and DRS Defendants was the novation agreement, which was recognized by the government. There is no evidence whatsoever as to any other agreement between TTGI and DRS Defendants, unlawful or otherwise. T he record contains no evidence that any Defendant performed a single act in furtherance of the (non-existent) unlawful agreement. The novation agreement served a single purpose:  to relieve DRS C3 &

36

Aviation of the rights and obligations of Task Order 10, and to impose them on TTGI. The Court finds neither anything unlawful about the novation agreement, nor evidence to support the existence of an unlawful agreement.

As with Counts I through VIII addressed above, Count IX is predicated exclusively upon Plaintiff's supposition and conclusory statements. The Court finds no evidence to support a finding that TTGI violated 31 U.S.C. § 3729(a)(1)(C). Accordingly, TTGI and DRS Defendants are entitled to judgment as a matter of law with respect to the conspiracy charge.

## III. CONCLUSION

For the reasons stated above, DRS Defendants and Defendant The Tolliver Group, Inc.'s Motions for Summary Judgment should be GRANTED, Plaintiff's Motion for Summary Judgment should be DENIED, the Plaintiff's outstanding motions should be denied. An appropriate order shall issue.

CLAUDE M. HILTON
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
~~October~~ _____, 2015
November 2

37